## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHRISTOPHER DALE LYMAN et al.,

       *Plaintiffs,*

v.

       Case No. 25-2023-EFM

THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY OF
GEARY COUNTY, KANSAS, et al.,

       *Defendants.*

## MEMORANDUM AND ORDER

Plaintiffs Christopher Dale Lyman and Tamarisk Thompson bring this suit on behalf of themselves and their minor children, E.L. and M.L. The suit seeks damages pursuant to 42 U.S.C. § 1983 for numerous constitutional violations stemming from the investigation into and prosecutions for the death of J.S., Mr. Lyman and Ms. Thompson's infant nephew. Defendants are Junction City Police Department ("JCPD") Detective Cory Odell, JCPD medical investigator, Dr. Terra Frazier, Geary County Coroner and Pathologist, Dr. Erik Mitchell, the City of Junction City, and the Board of County Commissioners of Geary County ("Geary County"). Each of the five Defendants have pending motions: Junction City, Dr. Frazier, and Dr. Mitchell filed Motions to Dismiss (Docs. 20, 28, & 46) and Geary County and Detective Odell filed Motions for Judgment on the Pleadings (Docs. 31 & 43). For the reasons below, the Court grants Junction City's Motion to Dismiss; grants in part and denies in part Dr. Frazier's Motion to Dismiss; construes Geary County's motion as a Motion to Dismiss and grants it; construes Detective Odell's motion as a

Motion to Dismiss and grants it; and grants in part and denies in part Dr. Mitchell's Motion to Dismiss.

## I.     Factual and Procedural Background[1]

This case arises out of the exceedingly sad circumstances related to J.S.'s untimely death. J.S. was the infant nephew of the then-married Mr. Lyman and Ms. Thompson and the son of Ms. Thompson's sister. J.S.'s development in utero was complicated by infection and his mother's involvement in two serious accidents. After his birth, J.S. suffered several health complications and was hospitalized on numerous occasions.

In 2013, Mr. Lyman, who served in the Army, returned to his and Ms. Thompson's home in Ohio after a deployment to Afghanistan. Partly because of J.S.'s medical issues, Ms. Thompson and Mr. Lyman agreed to watch J.S. while his mother worked.

In July 2013, Mr. Lyman took an assignment at Fort Riley, Kansas. Because J.S.'s mother struggled to find childcare for J.S., she asked Mr. Lyman and Ms. Thompson if they would take custody of J.S. in Kansas. After agreeing to do so, Ms. Thompson brought J.S. to Kansas on August 18, 2013.

In the early morning hours of September 15, 2013, Mr. Lyman found J.S. pale, cold, and limp. Recognizing that something was wrong, Mr. Lyman performed CPR on J.S. Ms. Thompson then rushed J.L. to the Geary County Hospital ("GCH"). The emergency department attempted to intubate J.S. without success until the fifth attempt. GCH staff informed Mr. Lyman and Ms. Thompson that they believed J.S. had suffered from interrupted SIDS, and that he would receive better treatment at Children's Mercy Hospital ("CMH") in Kansas City. Arrangements were made for J.S. to be transported via life flight to CMH.

---

[1] The facts are taken from Plaintiffs' Complaint and are considered true for the purpose of this Order.

After being reassured by GCH staff that J.S. would be fine, Ms. Thompson left GCH a couple of hours later to attend a previously scheduled work trip to California. Mr. Lyman drove Ms. Thompson to the Manhattan, Kansas airport. While Mr. Lyman was dropping Ms. Thompson off at the airport, GCH called JCPD to report possible child abuse.

A JCPD officer responded to the call and took pictures of J.S. at GCH. This officer documented a bruise on J.S.'s right cheek, a very small bruise by J.S.'s mouth, and "reddish discoloration on his forehead." Upon Mr. Lyman's return to GCH, the JCPD officer interviewed Mr. Lyman who answered the officer's questions and described J.S.'s complicated medical history. Afterwards, J.S. was life-flighted to CMH, arriving at CMH at 9:00 a.m.

Detective Odell served as JCPD's detective for crimes against children and took over the investigation regarding J.S. Detective Odell previously worked with Dr. Frazier, who led a child abuse team at CMH, and delegated the investigation of J.S.'s child abuse to Dr. Frazier. Throughout the entire investigation, Detective Odell and Dr. Frazier frequently communicated, with Dr. Frazier acting as Detective Odell's medical investigator.

Shortly after J.S. arrived to CMH, Dr. Frazier evaluated J.S. and concluded that J.S. had been abused. Dr. Frazier reported to Detective Odell that J.S. had "bruising and tearing to his anus," "bruising to both cheeks, nose, forehead," "tearing inside his mouth on both top and bottom gums," a "scab at back of [his] head with missing hair," "bleeding around his brain," and "bruising to [his] chest, abdomen, lower back, and buttocks." These findings are not supported by, and are inconsistent with, the GCH emergency department's intake records and the initial responding JCPD officer's documentation. In making these findings, Dr. Frazier did not review the records from GCH or J.S.'s extensive medical records, nor did she speak with staff from GCH, or any family members about J.S.'s complicated medical history.

Based upon Dr. Frazier's findings, Detective Odell placed a "Be On the Lookout" ("BOLO") alert through the Kansas Bureau of Investigations for Mr. Lyman and Ms. Thompson. The alert noted that Mr. Lyman and Ms. Thompson may have their 15-month-old child, E.L., with them and that E.L. must be taken into police custody.

After the BOLO alert was sent out, Mr. Lyman, who had driven from GCH in Junction City, arrived at CMH in Kansas City. CMH staff barred Mr. Lyman from entry and told him that he would be arrested for trespassing if he did not leave. After being denied entry to CMH, Mr. Lyman returned to Junction City where he was immediately seized by JCPD. Mr. Lyman was interrogated by Detective Odell.

During the interrogation, Detective Odell was in contact with Dr. Frazier who helped guide the conversation. Mr. Lyman told Detective Odell about J.S.'s complicated medical history and denied that he or Ms. Thompson had harmed J.S. Based upon Dr. Frazier's report, Detective Odell arrested Mr. Lyman for child abuse and aggravated battery. After arresting Mr. Lyman, knowing that Ms. Thompson was out of the state, Detective Odell ordered E.L., who was at a babysitter's, to be taken into custody as a child in need of care.

After arriving in California for her work trip, and unable to get ahold of Mr. Lyman, Ms. Thompson contacted JCPD and spoke with Detective Odell. After she learned that Mr. Lyman had been arrested, she asked where E.L. was. Detective Odell falsely told her that E.L. was at the babysitter's despite having already taken E.L. into police custody. Ms. Thompson immediately booked travel back to Kansas. She later learned that E.L. was in police custody and that she was scheduled to be interviewed by Detective Odell on the morning of September 17, 2013. She believed that E.L. would be returned to her after this interview.

Meanwhile, J.S.'s mother, who had been alerted to the situation by Mr. Lyman and Ms. Thomspon, travelled from Ohio to Kansas City. CMH initially barred her from entering, but she was allowed entry the morning of September 16, 2013. Dr. Frazier spoke with J.S.'s mother and attempted to implicate Mr. Lyman. J.S.'s mother communicated J.S.'s complicated medical history and reiterated that she believed that Mr. Lyman did not abuse J.S. Dr. Frazier then called Ms. Thompson who corroborated Mr. Lyman's and J.S.'s mother's recitation of J.S.'s complicated medical history and Mr. Lyman's care and attentiveness to J.S. A nurse documented J.S.'s mother's frustration that the investigation was focused on Mr. Lyman. Plaintiffs allege that Dr. Frazier and Detective Odell suppressed this information.

In the early morning hours of September 17, 2013, J.S. was pronounced dead. Later that morning, Detective Odell interviewed Ms. Thompson. Ms. Thompson provided exonerating information for Mr. Lyman, described J.S.'s complicated medical history, and reiterated that Mr. Lyman did not abuse J.S. Instead of accepting Ms. Thompson's explanations, Detective Odell arrested Ms. Thompson for the murder of J.S. He did this so that she would not testify to the exonerating evidence she had provided and in hopes of coercing her to testify against Mr. Lyman. Mr. Lyman's bond for the charge of the murder of J.S. was $1 million, but Ms. Thompson's bond was only $10,000.

Dr. Mitchell, the Deputy District Coroner and the Pathologist for Geary County and its Coroner's office, examined J.S. after his death on two occasions: September 17 and 19, 2023. Dr. Mitchell did not review J.S.'s previous medical records. However, on September 17, Dr. Mitchell found "no rectal tear is defined" and opined that J.S.'s cause of death was "head trauma."

Six months later, Detective Odell sent Dr. Mitchell a photograph of Mr. Lyman holding J.S. In a supplemental report, Dr. Mitchell opined that the bruises found on J.S.'s body could have

been caused by Mr. Lyman holding J.S. in the manner depicted in the photograph. Defendants did not disclose this supplemental report to Mr. Lyman or Ms. Thompson's criminal defense teams in violation of *Brady v. Maryland*.[2]

In June 2014, Dr. Mitchell provided a third report that acknowledged that the head injuries he observed were insufficient to cause J.S.'s death. Rather, Dr. Mitchell concluded that J.S. died of "direct brain trauma."

Dr. Mitchell changed another one of his opinions at the behest of Detective Odell. Detective Odell feared that there was not enough evidence to persuade a jury to convict Mr. Lyman, so he pressured Dr. Mitchell to find that J.S. suffered "anal tears." With this changed opinion, Mr. Lyman was charged with using Ms. Thompson's sex toys to sexually abuse J.S. Plaintiffs allege that this claim was entirely false.

As the charges and investigation were pending, E.L. was placed in foster care. Initially, Ms. Thompson was granted a weekly one-hour visit with E.L. While in foster care, E.L. was examined for signs of child abuse; there were no signs that E.L. was the victim of sexual or physical abuse. E.L.'s foster parents reported that he was harming himself, self-mutilating, not eating, and had become nonverbal because he was being kept from his mother. Nevertheless, Defendants refused to release E.L. back to Ms. Thompson. Eventually, Ms. Thompson was granted a daily two-hour visitation. In May 2014, Ms. Thompson gave birth to her and Mr. Lyman's second son, M.L. 24 hours after M.L.'s birth, M.L. was taken from Ms. Thompson and placed in foster care. Ms. Thompson was only granted four hours of visitation per day with her newborn.

---

[2] 373 U.S. 83 (1963) (holding that a prosecutor suppressing evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment).

Throughout the investigation and for at least 20 months, Ms. Thompson's visitation rights fluctuated as Defendants attempted to bargain with her. When they wanted to encourage her to cooperate with Mr. Lyman's prosecution, they would grant her more visitation. When they wanted to discourage her from supporting Mr. Lyman, they would cut her visitation back. Detective Odell testified at child custody hearings to prevent Ms. Thompson from receiving custody of her sons. Ms. Thompson's mother filed for custody of her grandchildren, but Detective Odell caused Geary County to object to the minors' grandmother taking custody. Instead, E.L. and M.L. were left in the foster care system where Detective Odell could continue using them as leverage over Ms. Thompson.

Leveraging Ms. Thompson's custody rights worked. Ms. Thompson did not testify at Mr. Lyman's trial or sentencing hearing even though she had alibi evidence and exonerating testimony. On May 14, 2015, Mr. Lyman was convicted of murder in the first degree, child abuse, and aggravated battery. He was found not guilty of aggravated criminal sodomy. On July 17, 2015, he was sentenced to life in prison with the possibility of parole, to run concurrent with separate 41-month and 32-month sentences. After Mr. Lyman's sentencing, on August 3, 2015, Ms. Thompson was returned custody of E.L. and M.L. At the time, her charges for murder were still pending. But on September 8, 2015, without ever having a preliminary hearing, Geary County dismissed the charges against Ms. Thompson. At some point, Ms. Thompson and Mr. Lyman were divorced because of his convictions.

Over the next several years, Mr. Lyman challenged his convictions. Mr. Lyman presented expert testimony indicating that J.S. died from natural causes and that the evidence relied upon by Dr. Frazier and Dr. Mitchell was not indicative of abusive head trauma, but rather complications from a medical condition.

After hearing this testimony, on January 17, 2023, Geary County District Court Judge Courtney Boehm vacated and set aside the judgment against Mr. Lyman and granted him a new trial. In that order, the Court found that the prosecution suppressed evidence that was favorable to Mr. Lyman in violation of *Brady*. Specifically, the Court found that two emails from Dr. Frazier and one email from Dr. Mitchell were not disclosed to the Mr. Lyman's defense team. Despite the evidence presented by Mr. Lyman and the court's order, Geary County indicated that it would hire a new expert and continue to pursue the prosecution.

Geary County's new expert was Dr. Jane Turner. She reviewed the evidence and determined in a June 26, 2023, report that J.S. suffered from "a serious fungal infection involving his skin, scalp, oral cavity, lungs, and brain" and ultimately concluded that J.S.'s cause of death was "disseminated fungal infection and the manner of death is natural." On July 12, 2023, Geary County dismissed the charges against Mr. Lyman, and he was freed.

Plaintiffs filed this suit on January 17, 2025, asserting 13 Counts under 42 U.S.C. § 1983 alleging various constitutional violations. Mr. Lyman and Ms. Thompson bring Counts I-VII. And Mr. Lyman and Ms. Thompson bring Counts VIII-XIII on behalf of E.L. and M.L. The latter six Counts, in most respects, mirror the first seven Counts.

Counts I and VIII are claims against Detective Odell, Dr. Frazier, and Dr. Mitchell in their individual capacities alleging that they fabricated and perpetuated false evidence.

Counts II and IX are claims against Detective Odell, Dr. Frazier, and Dr. Mitchell in their individual capacities alleging that they conspired to fabricate and perpetuate false evidence.

Count III is a claim against Detective Odell, Dr. Frazier, and Dr. Mitchell in their individual capacities alleging that they committed *Brady* violations and fabricated evidence.

Counts IV and X are claims against Detective Odell, Dr. Frazier, and Dr. Mitchell in their individual capacities alleging that they maliciously prosecuted and unlawfully detained Plaintiffs.

Counts V and XI are claims against all Defendants that they conspired to deprive Plaintiffs of their constitutional rights.

Counts VI and XII are claims against Detective Odell, Dr. Frazier, and Dr. Mitchell in their individual capacities alleging that they interfered with Plaintiffs' family relationships.

Counts VII and XIII are claims against Junction City and Geary County ("the Municipal Defendants"), alleging that they are liable for the described constitutional violations committed by their employees.

Each Defendant has filed either a Motion to Dismiss or Motion for Judgment on the Pleadings. Timely responses and replies were filed to each. The matters are now fully briefed and ripe for the Court's ruling.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with

---

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

fair notice of the nature of claims as well as the grounds on which each claim rests.[6] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[7] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[9]

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."[10] The standard for entering judgment on the pleadings under Rule 12(c) is the same as a dismissal under Rule 12(b)(6).[11] To survive a motion for judgment on the pleadings, the complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face."[12] All reasonable inferences from the pleadings are granted in favor of the non-moving party.[13] Judgment on the pleadings is appropriate when "the moving party has clearly established that no material issue of

---

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[10] Fed. R. Civ. P. 12(c).

[11] *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013).

[12] *Twombly*, 550 U.S. at 555.

[13] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1141 (10th Cir. 2012) (citation omitted).

fact remains to be resolved and the party is entitled to judgment as a matter of law."[14] Documents

attached to the pleadings are exhibits and may be considered in deciding a Rule 12(c) motion.[15]

### III.    Analysis

#### A.    Rule 8

Every Defendant except Detective Odell moves to dismiss Plaintiffs' Complaint for

violating Federal Rule of Civil Procedure 8. Rule 8 requires that a complaint contain "a short and

plain statement of the claim" sufficient to show grounds for relief.[16] "Short" and "plain" are the

only adjectives used to describe a proper pleading. Neither adjective can be used to describe

Plaintiffs' Complaint.

Plaintiffs' 99-page Complaint contains 496 numbered paragraphs. Some of those

paragraphs detail Mr. Lyman's military history. Paragraph 49, for example, includes the full

citation accompanying Mr. Lyman's Bronze Star award. Other paragraphs detail Ms. Thompson's

travel difficulties as she returned from California—including the airports she flew through with

departure and arrival times. Five paragraphs detail Dr. Turner's qualifications, the forensic

pathologist who wrote the report leading to the dismissal of Mr. Lyman's charges. More than three

pages describe the history of the text of § 1983.

Prolixity undermines a complaint's utility.[17] And a plaintiff risks running "afoul of Rule 8

through unnecessary length and burying of material allegations in 'a morass of irrelevancies.'"[18]

---

[14] *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006) (citations and quotations omitted), *abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co.*, 545 F. App'x 750, 753 (10th Cir. 2013).

[15] *Id.*

[16] Fed. R. Civ. P. 8(a)(2).

[17] *Baker v. City of Loveland*, 686 F. App'x 619, 620 (10th Cir. 2017) (citing *Knox v. First Sec. Bank*, 196 F.2d 112, 117 (10th Cir. 1952)).

[18] *Id.* (quoting *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007)).

Here, many of the numbered facts are blatantly designed as appeals to emotion and read like the narration of a true crime show. Of course, some of these facts may be important to advance Plaintiffs' claims as this case progresses. But when the Rule requires a short and plain statement, a Plaintiff should not dress up the Complaint with all the hallmarks of a closing argument.

For a Rule 8 violation, striking the surplusage or dismissing the Complaint are both within the Court's discretion.[19] But striking the surplusage would burdensomely require the Court to do Plaintiffs' job of cutting out the fat and leaving the meat, while dismissal would likely only result in the filing of an amended complaint.[20] This would almost certainly be followed by Defendants filing a second round of the same motions. Because much of the substance of Defendants' pending motions can be addressed, the Court will not "insist[] that the parties perfect their pleadings" but will "bypass the dross and get on with the case."[21]

## B.    Statute of Limitations on Ms. Thompson's Claims

Detective Odell moves for judgment on the pleadings asserting that Ms. Thompson's claims are barred by the statute of limitations. Although Ms. Thompson does not raise a procedural challenge to Detective Odell's motion for judgment on the pleadings, because it is premature, the Court construes Detective Odell's motion as a motion to dismiss.[22] Drs. Frazier and Mitchell move

---

[19] *See id.* at 621–22.

[20] *See* Fed. R. Civ. P. 15(a)(2) (stating that "[t]he court should freely give leave" to amend a complaint); *see also Gilmore v. Beveridge*, 2022 WL 1288484, at *2 (D. Kan. Apr. 29, 2022) ("More commonly, Rule 8(a) violations result in allowing the plaintiff an opportunity to replead.").

[21] *U.S. ex rel. Garst v. Lockheed-Martin Corp*, 328 F.3d 374, 378 (7th Cir. 2003).

[22] Fed. R. Civ. P. 12(c) ("After the pleadings are closed . . . a party may move for judgment on the pleadings."). *See also* 5C CHARLES ALAN WRIGHT & ARHTUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1368 (3d ed. 2025) ("Because of the similarity between the Rule 12(c) and Rule 12(b) standards, courts typically will construe a premature Rule 12(c) motions as if it were brought under Rule 12(b)."). Plaintiffs challenge the procedural posture of Geary County's Motion for Judgment on the Pleadings. The Court provides more explanation for construing these motions as motions to dismiss there.

to dismiss Ms. Thompson's claims against them for the same reason. Because the parties' arguments in the motions are largely the same, the Court will consolidate its discussion of this topic for all three motions.

Courts look to state law to determine the applicable limitations for a § 1983 action because § 1983 does not contain an express statute of limitations.[23] As most § 1983 actions are actions for injury to a personal right, courts "apply the statute of limitations applicable for personal injury actions in the state where the claim accrued."[24] Applied here, the statute of limitations is two years.[25]

Ms. Thompson's claims stem from her unjust arrest, detention, prosecution, and the loss of custody of her children. Her children were returned to her on August 3, 2015, and the charges filed against her were dismissed on September 8, 2015. Plaintiffs, including Ms. Thompson, filed this case on January 17, 2025. Because 2025 is more than two years after 2015,[26] Defendants assert that the statute of limitations bars Ms. Thompson's claims.

Ms. Thompson suggests that state statutes of limitations are preempted by the original text of § 1983. This novel argument asserts that § 1983 statute of limitations jurisprudence is flawed because it is premised upon an erroneous version of the statute—not the statute as originally passed

---

[23] *Keith v. Koerner*, 843 F.3d 833, 850 (10th Cir. 2016) (citing *Garcia v. Wilson*, 731 F.2d 640, 642 (10th Cir. 1984)).

[24] *Id.*

[25] K.S.A. 60-513(a)(4); *see also Keith*, 843 F.3d at 850–51 ("The two-year statute of limitation for injuries to the rights of others . . . applies to civil rights actions brought pursuant to section 1983." (quoting *Cameron v. Stotts*, 1994 WL 697385, at *1 (10th Cir. 1994))).

[26] Ms. Thompson make no argument that her causes of actions accrued after 2015. Rather, her argument focuses on tolling the statute of limitations. As such, the Court considers 2015 as the year Ms. Thompson's causes of action accrued.

by Congress.[27] Although Ms. Thompson cites to scholarship[28] and some judicial interaction with this idea,[29] this Court is not at liberty to ignore binding precedent.[30] That precedent requires this Court to apply Kansas's two-year statute of limitations and Kansas's accompanying tolling rules to this action.[31]

Next, Ms. Thompson invokes the doctrines of equitable tolling and equitable estoppel to save her claims. She asserts that she delayed filing suit because she "remained in fear that she would be re-prosecuted, and her sons abducted again if she spoke out about the injustice she suffered."[32] Only after the pathologist report that determined that J.S. died of natural causes cleared her and Mr. Lyman's name, did she feel she could bring suit without retaliation. Because of these reasons, she asserts that whether the statute of limitations should be tolled is a factual question that cannot be resolved during the motion to dismiss phase. She cites *Keith v. Koerner*[33] for this proposition.

---

[27] The argument goes like this. The original statute passed by Congress in 1871 provided: "Any person who, under color of state law . . . [deprives another] of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable . . ." Civil Rights Act of 1871, § 1, 17 Stat. 13 (1871) (current version at 42 U.SC. § 1983) (emphasis added). The italicized language, described as the "Notwithstanding Clause," was omitted from the first compilation of federal law in 1874 by the Revisor of Federal Statutes. The omission has never been corrected, and the jurisprudence interpreting the statute has never taken account of the omitted language. As applied here, Plaintiffs argue that the original text of the statute imposes liability upon Defendants *notwithstanding* Kansas's statute of limitations.

[28] *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201, 234–38 (discussing "The Lost Text of Section 1983").

[29] *See, e.g.*, *Rogers v. Jarrett*, 63 F.4th 971, 980–81 (5th Cir. 2023) (Willett, J., concurring) ("These are game-changing arguments.").

[30] *See id.* at 981 ("[H]owever seismic the implications of this lost-text research, as middle-management circuit judges, we cannot overrule the Supreme Court. Only that Court can definitively grapple with § 1983's enacted text and decide whether it means what it says." (internal quotations and citations omitted)).

[31] *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 484 (1980) ("In § 1983 actions . . . a state statute of limitations and the coordinate tolling rules are . . . [i]n most cases . . . binding rules of law.").

[32] Doc. 1 at ¶ 233.

[33] 843 F.3d 833 (10th Cir. 2016).

In *Keith*, the district court denied a defendant's motion for summary judgment, finding that there was a factual dispute as to whether the statute of limitations barred the plaintiff's claim.[34] But the factual question was whether a particular Kansas statute that authorizes tolling applied.[35] The statute in question tolls the statute of limitations during a potential plaintiff's time of incarceration.[36] There, the plaintiff pled facts that put at issue whether she had access to the courts while she was incarcerated such that the application of this statutory tolling provision was in question.[37]

"In Kansas, a trial court cannot toll a limitations period; only the legislature, by statue, may do so."[38] Here, Ms. Thompson is not relying on a statutory provision to toll the statute of limitations. So, unlike in *Keith*, there is not a factual dispute as to whether a statutory provision applies. Rather, Ms. Thompson asserts that equitable tolling and equitable estoppel apply; each is addressed in turn.

Equitable tolling is an extraordinary remedy that is applied sparingly.[39] It tolls the running of the statute of limitations when a plaintiff shows "that he has been pursuing his rights diligently, and that some extraordinary circumstance stood in his way and prevented timely filing."[40] Here,

---

[34] *Id.* at 850.

[35] *Id.* at 850–51 (discussing the applicability of K.S.A. 60-515(a)).

[36] K.S.A. 60-515(a) ("[I]f any person entitled to bring an action . . . at the time the cause of action accrued or at any time during the period the statute of limitations is running, is . . . imprisoned for a term less than such person's natural life, such person shall be entitled to bring such action within one year after the person's disability is removed.").

[37] *See Keith*, 843 F.3d at 851.

[38] *Bell v. City of Topeka*, 279 F. App'x 689, 692 (10th Cir. 2008) (citing *McCoy v. Wesly Hosp. & Nurse Training Sch.*, 188 Kan. 325, 362 P.2d 841, 847 (1961)).

[39] *Irwin v. Dep't of Veteran Affs*, 489 U.S. 89, 96 (1990).

[40] *In re Bell*, 317 Kan. 334, 529 P.3d 153, 157 (2023) (internal quotations omitted) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

Ms. Thompson pleads no facts to demonstrate that she had been pursuing her rights diligently prior to filing this suit in 2025. Accordingly, she is not entitled to equitable tolling of the statute of limitations.

"The equitable estoppel rule is designed to prevent parties, both at law and in equity, from asserting certain rights against another person who detrimentally relies on the actor's deceitful conduct."[41] There are two fundamental elements to this doctrine: misrepresentation and detrimental reliance.[42] Here, Ms. Thompson does not plead misrepresentation or detrimental reliance upon that misrepresentation. Instead, she pleads that her fear reasonably caused her to delay filing suit. In other words, she pleads that she was under duress. But when there are no allegations of fraud or misrepresentation, duress is not sufficient to toll the statute of limitations.[43]

Because Ms. Thompson has not pled that she detrimentally relied upon some misrepresentation made by Defendants, even accepting that her fear was real and reasonable, the doctrine of equitable estoppel does not prevent Defendants from asserting their statute of limitations defense. Detective Odell, Dr. Frazier, and Dr. Mitchell have sufficiently demonstrated that the two-year statute of limitations has expired on Ms. Thompson's claims. As such, the Court dismisses Ms. Thompson's claims against Detective Odell, Dr. Frazier and Dr. Mitchell.

## C. Count II: Conspiracy to Deprive Constitutional Rights by Fabricating and Perpetuating False Evidence against Detective Odell, Dr. Frazier, and Dr. Mitchell

Count II alleges that Detective Odell, Dr. Frazier, and Dr. Mitchell conspired to deprive Mr. Lyman and Ms. Thompson of their constitutional rights by fabricating and perpetuating

---

[41] *L. Ruth Fawcett Tr. v. Oil Producers Inc.*, 315 Kan. 259, 507 P.3d 1124, 1145 (2022) (citing *Gillespie v. Seymour*, 250 Kan. 123, 823 P.2d 782, 788 (1991)).

[42] *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 994 (10th Cir. 2019).

[43] *P.W.P. v. L.S.*, 266 Kan. 417, 969 P.2d 896, 904 (1998).

knowingly false evidence. Dr. Mitchell moves to dismiss Mr. Lyman's claim against him in Count II for two reasons: it is duplicative with Count V and Plaintiffs have not alleged facts to establish a conspiracy. Plaintiffs respond by distinguishing Count II from Count V and asserting that they have pled sufficient facts to state a conspiracy.

Plaintiffs sufficiently distinguish Count II from Count V. Plaintiffs clarify in their Response that Count II is about the conspiracy to fabricate and perpetuate a knowingly false cause of death, whereas the conspiracy alleged in Count V is about withholding exculpatory evidence. With this clarification, the Court is satisfied that the claims are not duplicative and will next address whether Plaintiffs have sufficiently pled a conspiracy claim.

"To prove a conspiracy under § 1983, a plaintiff must show 'at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective.'"[44]

As alleged, Dr. Mitchell manufactured J.S.'s cause of death as "head trauma" without evidence and later opined that J.S. suffered from "direct brain trauma." Dr. Mitchell came to this conclusion after collaborating with Detective Odell and Dr. Frazier to falsely implicate Mr. Lyman in J.S.'s death. Further, as alleged, at the behest of Detective Odell, Dr. Mitchell changed his expert opinion to find that J.S. had suffered anal tears to add a sexual abuse charge against Mr. Lyman and to deter Ms. Thompson from testifying. These facts are sufficient to show "an agreement and concerted action amongst the defendants"[45] to fabricate and perpetuate false evidence. Accordingly, Plaintiffs have pled facts sufficient to plausibly allege that Dr. Mitchell conspired to

---

[44] *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010), *overruled, in part, on other grounds*).

[45] *Id.* (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998)).

deprive Mr. Lyman of his constitutional rights by fabricating evidence, and the Court denies Dr.

Mitchell's motion to dismiss the claim against him in Count II.

### D. Count III: *Brady* Violations and Fabricating Evidence against Detective Odell, Dr. Frazier, and Dr. Mitchell

Both Drs. Frazier and Mitchell move to dismiss Count III which alleges that they

committed *Brady* violations. *Brady* established that "suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[46] The

elements of such a claim are "'(1) the prosecution suppressed evidence, (2) the evidence was

favorable to the defendant, and (3) the evidence was material.'"[47] Typically, prosecutors are

responsible for disclosing material evidence to the defense, but "the 'prosecution' for *Brady*

purposes encompasses not only the individual prosecutor handling the case, but also extends to the

prosecutor's entire office as well as law enforcement personnel and other arms of the state involved

in investigative aspects of a particular criminal venture."[48] The "knowing and intentional failure

of an investigator to turn over exculpatory evidence creates liability" under § 1983.[49]

First, the Court will address Plaintiffs' collateral estoppel argument which applies equally

to Dr. Frazier and Dr. Mitchell's motions. Next, the Court will address the individual grounds for

dismissing this claim presented by Dr. Frazier and Dr. Mitchell, respectively.

---

[46] *Brady*, 373 U.S. at 87 .

[47] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024) (quoting *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019)).

[48] *United States v. Dermen*, 143 F.4th 1148, 1196 (10th Cir. 2025) (quoting *Smith v. Sec'y of N.M. Dept. of Corr.*, 50 F.3d 801, 825 (10th Cir. 1995)).

[49] *Tiscerano v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011), *vacated in part on other grounds*, 421 F. App'x 842 (10th Cir. 2011)).

1.    *Collateral Estoppel*

In response to both Drs. Frazier and Mitchell's motions to dismiss the *Brady* claim,

Plaintiffs assert that these Defendants should be collaterally estopped from challenging whether

they are liable for a *Brady* violation. Plaintiffs argue that, because a state court already determined

that a *Brady* violation occurred, this Court cannot address the issue. Indeed, under Kansas law,

collateral estoppel "prevents a second litigation of the same issue between the same parties, even

when raised in a different claim or cause of action."[50] There are three elements to this doctrine:

"(1) a prior judgment on the merits that determined the parties' rights and liabilities on the issue

based upon ultimate facts as disclosed by the pleadings and judgment; (2) the same parties or

parties in privity; and (3) the issue litigated must have been determined and necessary to support

the judgment."[51] Drs. Frazier and Mitchell attach the state court order in support of their motions,

which the Court must look at to address this argument.[52]

The state court's order reveals that Plaintiffs cannot meet the first element of the collateral

estoppel doctrine. While the state court order does find that a *Brady* violation occurred, it does not

assign liability to either Drs. Frazier or Mitchell for the violations. Rather, it implies that the

---

[50] *In re Application of Fleet for Relief from a Tax Grievance in Shawnee Cnty.*, 293 Kan. 768, 272 P.3d 583, 589 (2012). "Issue preclusion" and "collateral estoppel" are interchangeable terms. *Id.*

[51] *Id.* at 589–90 (citing *Venter v. Sellers*, 293 Kan. 87, 261 P.3d 538, 547 (2011)).

[52] Generally, a motion to dismiss should be decided based upon the facts in the complaint without looking to other evidence. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Three exceptions to this limitation on what the court can consider exist: "(1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice." *Id.* (citations omitted). Here, Plaintiffs make several references to the state court order in the Complaint—and cite it in support their collateral estoppel argument. Because the state court order is referred to in the Complaint, its contents are central to this claim, and the parties do not dispute its authenticity, the Court may properly consider it without converting this motion into a motion for summary judgment. *See id.* ("If a district court intends to rely on other evidence, it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties.").

violations were committed by the Geary County prosecutor.[53] Because Plaintiffs sue Drs. Frazier and Mitchell in their individual capacity, the issue presented to this Court is whether these Defendants can be held personally liable for the *Brady* violations. The state court order cannot be said to have "determined the rights and liabilities on the issue" of whether Drs. Frazier and Mitchell are personally liable for the violations. Accordingly, these Defendants are not collaterally estopped from challenging this claim. The Court moves on to addresses the arguments in Drs. Frazier's and Mitchell's individual motions to dismiss.

      2.     *Dr. Frazier's Motion to Dismiss*

Dr. Frazier asserts that Plaintiffs have not sufficiently stated a claim against her because the particular evidence underlying the *Brady* violation was either independently available to Mr. Lyman's defense or that Dr. Frazier had discharged her duty related to the evidence. Plaintiffs respond that they have sufficiently pled facts to support a *Brady* violation claim and that to dismiss would be to ignore the well-pleaded facts in the Complaint. The Court agrees with Plaintiffs.

Plaintiffs allege that Dr. Frazier withheld three pieces of exculpatory evidence during Mr. Lyman's trial: (1) an email from Dr. Frazier regarding Mr. Lyman's expert's poor reputation and suspect opinions; (2) an email from Dr. Frazier discussing alternate sources of bruises found on J.S.; and (3) medical records internal to CMH. The Court will begin with the emails.

The state court order contains a discussion of three emails that were not disclosed to the defense prior to Mr. Lyman's criminal trial. Dr. Frazier does not dispute that the state court order finds that the emails' non-disclosure constituted a *Brady* violation. But she asserts that, because the recipient of the emails was the prosecutor, Dr. Frazier discharged her duty under *Brady*. In its

---

[53] The discussion of the *Brady* violations in the state court order falls underneath a heading that reads "[Mr. Lyman] claims that the Prosecutor suppressed exculpatory evidence."

discussion of the email regarding Mr. Lyman's expert, the court order details that the email was sent from Dr. Frazier to a Geary County prosecutor. But the order only describes the email discussing alternate sources of J.S.'s bruises as from Dr. Frazier; no recipient is identified. This leaves as an open question whether this particular email was received by the Geary County prosecutor before Mr. Lyman's criminal trial, and hence whether Dr. Frazier discharged her duty to turn over this information to the prosecutor. At this stage in the proceedings, the Court cannot resolve factual disputes. Rather, it must accept the facts in the Complaint as true.

There are also factual disputes that the Court cannot resolve at this stage regarding the medical records. Dr. Frazier asserts that Plaintiffs were aware of the CMH records before Mr. Lyman's trial and thus no *Brady* violation could have occurred.[54] To accept that Plaintiffs possessed this evidence would be to disregard the allegations of the Complaint in favor of Dr. Frazier's assertions. Again, at this stage in the proceedings, the Court must assume the veracity of the well-pleaded factual allegations in the Complaint.[55] As such, Plaintiffs' *Brady* claims against Dr. Frazier survive the motion to dismiss.[56]

---

[54] *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) (citing cases to demonstrate that a *Brady* violation does not occur "if the defendant knew of the evidence anyway").

[55] *Iqbal*, 556 U.S. at 679.

[56] Dr. Frazier raises a separate ground to dismiss the *Brady* claim brought by Ms. Thompson that warrants a brief discussion. *Brady* is a trial right. *Johnson*, 99 F.4th at 1226 n.11 ("*Brady* is a trial right—that is, a violation arises when the government does not provide the defense with material exculpatory evidence in its possession for use at trial."). Although Ms. Thompson was criminally charged, her charges were dismissed before a preliminary hearing. Because Ms. Thompson's case never reached any hearing, her trial right to *Brady* disclosures was never triggered. Further, to proceed on a § 1983 claim alleging a *Brady* violation, a criminal trial must usually have resulted in a conviction. *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999). Ms. Thompson also asserts that *Brady* should apply to her child custody hearings. But the Court can find no authority, and Ms. Thompson does not provide any, that justifies extending *Brady* protections to child custody hearings. As such, Ms. Thompson's *Brady* claim fails on this ground as well as the statute of limitations addressed above.

### 3. Dr. Mitchell's Motion to Dismiss

Dr. Mitchell asserts the defense of qualified immunity as to the allegation that he violated *Brady*. Once a defendant has asserted qualified immunity, the burden is on the plaintiff to prove (1) the officer violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the unlawful conduct.[57] A right is "clearly established" if Supreme Court or Tenth Circuit precedent (or the weight of authority from other circuits) would put reasonable officers in the defendants' position on notice they were violating the constitution.[58] The law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[59] This does not require the existence of a case exactly on point,[60] but does require that the existing caselaw be sufficiently clear to place the constitutional issue "beyond debate."[61] "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[62] The Court has the discretion to determine the order in which these requirements are addressed.[63] The Court will address the clearly established prong first.

The dispositive question is "whether the violative nature of *particular* conduct is clearly established," which "must be undertaken in light of the specific context of the case, not as a broad general proposition."[64] As such, the Court must determine the specific context of the allegations

---

[57] *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[58] *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017).

[59] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted).

[60] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[61] *White v. Pauly*, 580 U.S. 73, 79 (2017).

[62] *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[63] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[64] *Mullenix*, 577 U.S. at 12 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

in this case and whether Dr. Mitchell's particular conduct is clearly established as violative of a constitutional right.

First, the context: The state court order makes a finding that an email sent by Dr. Mitchell to Detective Odell was not disclosed to Mr. Lyman's defense team before his criminal trial, and that this non-disclosure constituted a *Brady* violation. It is clear in the state court order that this email was between Dr. Mitchell and Detective Odell, the lead detective in the case. Next, the particular conduct: Dr. Mitchell's alleged violative act is that he did not disclose this email or its contents to Mr. Lyman's defense team before his criminal trial. With the stage set, the Court next addresses Plaintiff's arguments against qualified immunity.

Plaintiffs first response to Dr. Mitchell's assertion of qualified immunity is to suggest Dr. Mitchell committed a direct *Brady* violation. They rely on the state court order's finding that the non-disclosure of the fact that Dr. Mitchell changed his report amounted to a *Brady* violation. But it is clear that Dr. Mitchell communicated his opinion to the lead detective in the case. Plaintiffs have provided no caselaw that would put Dr. Mitchell—as a county coroner—on notice that he had an *independent* duty to disclose his opinion to the defense team when he had already communicated his opinion to the lead detective in the case. And as discussed above, the state court order does not assign responsibility to Dr. Mitchell for this violation.

Next, Plaintiffs shift gears and focus on the allegation that Dr. Mitchell fabricated evidence to support their *Brady* violation claim. Plaintiffs point to *Pierce v. Gilchrist* to support their argument that Dr. Mitchell "had 'fair warning' that the deliberate or reckless falsification or omission of evidence was a constitutional violation."[65] But *Pierce* held that "the knowing and

---

[65] *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004).

intentional failure of an investigator to turn over exculpatory evidence creates liability."[66] The Tenth Circuit has stated that all that is clearly established in this context is that "an investigator must not knowingly or recklessly cause a *Brady* violation."[67] And *Brady* is concerned primarily with the suppression and non-disclosure of evidence—not just with the fabrication.[68] So, "an investigator facing a § 1983 suit is liable for information that he knew or should have known and failed to disclose to the prosecutor."[69] Although Plaintiffs have alleged that the emails show that Dr. Mitchell changed his report—which supports their fabrication of evidence claims in Counts I and II—there is no allegation that he withheld this information from the prosecutor.

Plaintiffs have not met their burden of demonstrating that Dr. Mitchell's conduct violated clearly established right, failing the second element of the qualified immunity analysis. Immunity exists if either element of this analysis is absent.[70] As such, the Court concludes that Dr. Mitchell is entitled to qualified immunity on this claim and the allegations against Dr. Mitchell in Count III are dismissed.

**E.    Count V: Conspiracy to Deprive Constitutional Rights against all Defendants**

Dr. Mitchell moves to dismiss Count V, brought by Mr. Lyman, for two reasons: it is duplicative with Count II and Plaintiffs fail to plead sufficient facts to establish a claim of conspiracy. As discussed above, Plaintiffs sufficiently distinguished this claim from Count II by

---

[66] *Tiscareno*, 639 F.3d at 1023 (citing *Pierce*, 359 F.3d at 1299).

[67] *Id.*

[68] *See Smith*, 50 F.3d at 823 ("The essence of the *Brady* rule is the proposition that nondisclosure of material exculpatory evidence violates a defendant's due process right to a fair trial.").

[69] *Tiscareno*, 639 F.3d at 1023.

[70] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

clarifying that Count V alleges a conspiracy to withhold exculpatory evidence from Mr. Lyman's defense team in violation of *Brady*.

However, Plaintiffs do not allege facts specific to Dr. Mitchell to plausibly plead that Dr. Mitchell acted in concert with Detective Odell or others to withhold exculpatory evidence from Plaintiffs. Rather, Plaintiffs make broad and conclusory statements such as "Defendants, including Odell, Frazier, and Mitchell, suppressed Mitchell's report"[71] and "Defendants withheld all of the above-described information purposefully."[72] These "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim'"[73] Because this claim against Dr. Mitchell relies on conclusory allegations rather than well-pleaded facts, the Court dismisses it as to Dr. Mitchell.

## F.   Count VI & XII: Interference with Family Relationships against Detective Odell, Dr. Frazier, and Dr. Mitchell

Dr. Mitchell moves to dismiss the interference with family relationships claims brought against him in both Counts VI and XII. A "forced separation of parent from child, even for a short time, represents a serious impingement" on a parent's right to familial association."[74] "But a parent must allege 'intent to interfere' with this right—that is, the defendant must have directed conduct at the familial relationship 'with knowledge that the statements or conduct will adversely affect that relationship.'"[75] Without pleading facts demonstrating that a defendant intended to interfere with this specific right, this claim fails.

---

[71] Doc. 1 at ¶ 188.

[72] Doc. 1 at ¶ 224.

[73] *Frasier*, 992 F.3d at 1024 (quoting *Tonkovich*, 159 F.3d at 533).

[74] *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1199 (10th Cir. 2010).

[75] *Thomas v. Kaven*, 765 F.3d 1183, 1195–96 (10th Cir. 2014) (quoting *Lowery v. Cnty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008)).

Here, Plaintiffs do not plead facts that demonstrate that Dr. Mitchell intended to interfere with their right to familial association. Plaintiffs point to their allegation that "Defendants . . . intended to deprive Plaintiffs of these constitutional rights."[76] This is not a statement of fact, but rather a legal conclusion. Outside of this allegation, the specific facts that Plaintiffs plead related to Dr. Mitchell's intent are as follows:

- Mitchell changed his opinion to find evidence that Mr. Lyman used Ms. Thompson's sex toys on J.S. "to embarrass [Ms. Thompson] and to prejudice [Mr. Lyman's] defense by shocking and outraging the jury;"[77]

- "Defendants also hoped Mitchell's changed opinion and adding a charge that [Mr. Lyman] sexually abused J.S. would also deter [Ms. Thompson] from testifying;"[78] and

- "Mitchell's statements in his third report were made for the *sole purpose* of falsely implicating either [Mr. Lyman] or [Ms. Thompson] as J.S.'s sole caregivers on the night before he was brought into GCH and to provide the prosecution with 'evidence' it could use to obtain a conviction of [Mr. Lyman], [Ms. Thompson], or both."[79]

While these facts show that Dr. Mitchell was motivated to obtain a conviction, none of these facts support the legal conclusion that Dr. Mitchell intended to deprive Plaintiffs of their right to familial association.

Because Plaintiffs fail to plead facts to support the conclusion that Dr. Mitchell intended to interfere with their right to familial association, Counts VI and XII related to Dr. Mitchell are dismissed.

---

[76] Doc. 1 at ¶ 335.

[77] Doc. 1 at ¶ 12.

[78] Doc. 1 at ¶ 215.

[79] Doc. 1 at ¶ 191 (emphasis added).

**G.    Count VIII & IX: Fabricating and Perpetuating False Evidence against Detective Odell, Dr. Frazier, and Dr. Mitchell**

Dr. Frazier and Dr. Mitchell move to dismiss E.L. and M.L.'s claim in Count VIII, fabrication of evidence, and their corresponding conspiracy claim in Count IX. Dr. Frazier and Dr. Mitchell assert that because E.L. and M.L. were never charged with crimes, no relief can be granted to them on these claims. The Court addresses Count VIII and IX in turn.

*1.    Count VIII*

A fabrication of evidence claim requires a plaintiff to allege "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt."[80]

E.L. and M.L. allege that they were stolen from their parents and put into state custody to support this claim. But as the fourth element implies, this type of claim is limited to the criminal-law context.[81] Because E.L. and M.L. were not charged, convicted, or sentenced, they cannot meet the fourth element of this claim. Further, it is well-established that a plaintiff cannot bring a § 1983 for the violation of someone else's rights.[82] So, E.L. and M.L. cannot rely on the allegations related to Mr. Lyman or Ms. Thompson's criminal charges to support their fabrication of evidence claim. As such, the Court grants Drs. Frazier and Mitchell's motions to dismiss Count VIII.

---

[80] *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (citations omitted).

[81] *See id.* at 1236 n.5 (discussing the extension of a fabrication of evidence claim to cases in which a plaintiff was acquitted if he could show that, without the fabricated evidence, he "would not have been *criminally* charged" (emphasis added)).

[82] *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) ("[A] section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else.").

2.      Count IX

As for Count IX, Drs. Mitchell and Fraizer argue that because E.L. and M.L. fail to state claims for the underlying constitutional violation of fabricating evidence, the corresponding conspiracy claim cannot stand.[83] In their response to Dr. Mitchell's motion, Plaintiffs agree that this conspiracy claim is contingent upon the Count VIII's survival. Because E.L. and M.L's fabricating evidence claim did not survive the motion to dismiss, the Court also dismisses this corresponding conspiracy to fabricate evidence claim against Drs. Frazier and Mitchell.

**H.      Count X: Malicious Prosecution and Unlawful Pretrial Detention against Detective Odell, Dr. Frazier, and Dr. Mitchell**

Drs. Frazier and Mitchell move to dismiss the malicious prosecution claim brought against them by E.L. and M.L in Count X. A malicious prosecution claim brought under § 1983 requires a showing that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."[84] Here, E.L. and M.L. cannot be granted relief on a claim of malicious prosecution because they cannot meet the first element showing that they were confined or prosecuted. As such, Count X is dismissed.

**I.      Count XI: Conspiracy to Deprive Constitutional Rights against all Defendants**

Dr. Mitchell moves to dismiss E.L. and M.L's conspiracy claims against him in Count XI. Plaintiffs agree that this conspiracy claim is contingent on the survival of E.L. and M.L.'s underlying constitutional claims. Because none of E.L. and M.L.'s underlying constitutional

---

[83] *See Lessard v. Cravitz*, 686 F. App'x 581, 587 n.2 (10th Cir. 2017).

[84] *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007).

claims against Dr. Mitchell survive his motion to dismiss, the Court dismisses the conspiracy claim against Dr. Mitchell.

## J.    Count VII & XIII: *Monell* Claims against the Municipal Defendants

The Complaint brings two *Monell* claims against Junction City and Geary County. Mr. Lyman and Ms. Thompson bring Count VII while E.L. and M.L bring Count XIII.

Plaintiffs seek to hold both Junction City and Geary County liable for all three individual Defendants' actions. Junction City disclaims that it can be liable for the acts of Dr. Frazier or Dr. Mitchell. The Court agrees with Junction City only with regard to Dr. Mitchell. Regarding Detective Odell, the Complaint makes clear that he is employed by Junction City.[85] Regarding Dr. Frazier, Plaintiffs plead that she was employed by JCPD as an investigator, that she was supervised by Detective Odell, who in turn was supervised by Junction City.[86] But regarding Dr. Mitchell, Plaintiffs plead that he was the Deputy District Coroner for Geary County, appointed and authorized by Geary County.[87] Aside from a conclusory statement that Dr. Mitchell's actions can be said to present the "official policy of the Municipal Defendants,"[88] Plaintiffs plead no facts that might tie Dr. Mitchell to Junction City. On the other hand, Geary County disclaims any liability for the acts of Detective Odell and Dr. Frazier, asserting that Plaintiffs have not pled facts that might tie them to Geary County. Accepting the allegations regarding the employment of the three Individual Defendants, the Court will consider Detective Odell and Dr. Frazier employees of Junction City and Dr. Mitchell an employee of Geary County.

---

[85] Doc. 1 at ¶ 35.

[86] Doc. 1 at ¶ 36.

[87] Doc. 1 at ¶ 37.

[88] Doc. 1 at ¶ 38.

Section 1983 states, in relevant part: "Every *person* who under color of [law] subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."[89] Overruling an earlier decision,[90] the Supreme Court has held that, a municipality may be sued as a "person" under section 1983.[91] But a municipality cannot be sued under § 1983 merely for the acts of its employees.[92] Instead, plaintiffs must establish that the municipality's unconstitutional policy or custom was the direct cause or moving force behind the alleged injury.[93] These are commonly referred to as *Monell* claims. Stating such a claim requires alleging facts that show (1) an official policy or custom, (2) causation, (3) and deliberate indifference."[94] A plaintiff may show the existence of such a policy or custom through: (1) a formal regulation or policy statement; (2) a widespread and well-settled practice within the municipality; (3) the decisions of employees with final policymaking authority; (4) ratification of subordinates' actions by a an employee with final policy-making authority, or (5) failure to adequately train or supervise employees as a result of deliberate indifference to potential injuries to the public.[95]

Plaintiffs allege that the two Municipal Defendants had official policies or customs that took the form of (1) widespread and well-settled practice; (2) ratification; and (3) failure to train. The Court will first address Junction City's motion to dismiss and the three forms by which

---

[89] 42 U.S.C. § 1983 (emphasis added).

[90] *See Monroe v. Pape*, 365 U.S. 167, 187 (1961) (holding that municipal governments may not be sued under section 1983 because "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]").

[91] S*ee Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[92] *See id.* at 691 ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

[93] *See id.* at 690, 694.

[94] *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020) (citation omitted).

[95] *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188–89 (10th Cir. 2010).

Plaintiffs seek to show the existence of an official policy or custom, then the Court will turn to the motion and arguments specific to Geary County.

    *1.*    *Junction City*

Plaintiffs allege that Junction City had unconstitutional official policies or customs that led to violations of Plaintiffs' rights through the actions of Detective Odell and Dr. Frazier. Plaintiffs assert that the official policies or customs took the form of (1) a widespread and well-settled practice, (2) ratification of subordinates' actions by final policymakers, and (3) failure to adequately train and supervise employees. Junction City asserts that Plaintiffs have not alleged facts sufficient to show any of these three forms of Junction City policy or custom. The Court will address each alleged form in turn.

    a.    Widespread and Well-Settled Unconstitutional Practice

Plaintiffs assert that, since 2013, Junction City has had informal policies, practices, and customs that led to a widespread practice of government officials abusing their authority. Outside of their own experience, Plaintiffs offer three examples to demonstrate the widespread practice of Junction City officials abusing their authority.

The first example is Detective Odell's illegal arrest of a minor. The Court of Appeals of Kansas affirmed a district court's suppression of a stop-turned-arrest made by Detective Odell, finding that Detective Odell did not have reasonable suspicion to support the initial stop of the minor.[96] As such, the appellate court affirmed that Detective Odell illegally stopped and arrested the minor.[97] Plaintiffs allege that rather than disciplining Detective Odell for this interaction, Junction City subsequently promoted him.

---

[96] *In re S.M.M.*, 281 P.3d 180 (Table), 2012 WL 3000397, at *3 (Kan. Ct. App. Jul. 20, 2012).

[97] *Id.* at *2–3.

The second example Plaintiffs offer as an abuse of authority is the firing of JCPD's Chief of Police in April 2024. In this instance, Junction City announced that the JCPD Chief was fired because of workplace concerns. Junction City investigated the issue but never disclosed their findings.

The third example Plaintiffs offer is an incident where Detective Odell and a new Chief of Police used social media to endorse a political candidate running for Geary County Sheriff. Both Detective Odell and the Chief were internally disciplined for their social media posts. Plaintiffs allege that this endorsement constitutes a class C misdemeanor in Kansas and that they should have been criminally prosecuted, which did not occur.

These last two examples bear no resemblance to Plaintiffs' alleged constitutional violations in this case. Although these examples may be instances of abuses of authority, their dissimilarity to the allegations in the Complaint make them poor exemplars of the "widespread practice" of which Plaintiffs complain.

That leaves only one instance of a similar violation committed by Detective Odell—the illegal stop and arrest. "[T]o prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way."[98] Plaintiffs draw parallels between Detective Odell's illegal stop of a minor and the violations alleged here: he hastily concluded that a crime had been committed and acted upon that incorrect conclusion. But describing only one similar incident "fall[s] far short of plausibly alleging a 'widespread practice' of [constitutional violations], much less a practice 'so permanent and well settled as to constitute a custom or usage

---

[98] *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (internal quotations and citation omitted).

with the force of law.'"[99] As such, the Court finds that Plaintiffs have not shown the existence of a policy or custom through a widespread practice of violative acts.

        b.      Failure to Adequately Train or Supervise

Plaintiffs next allege the existence of a Junction City policy or custom in the form of its failure to train its employees. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.[100] To make such a claim, a plaintiff must plead facts showing "a municipality's failure to train its employees in a relevant respect . . .[that] amounts to deliberate indifference to the rights of persons with whom the untrained employees come into contact."[101] But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[102]

Junction City asserts that Plaintiffs have not pled facts sufficient to establish liability on a failure-to-train-or-supervise theory. Plaintiffs respond with incidents related to Detective Odell and Dr. Frazier from which Junction City should have known of its need to provide better training or supervision.

Regarding Detective Odell, Plaintiffs point to two of the same examples from their "widespread practice" argument: the Kansas Court of Appeals' finding that Detective Odell did not have reasonable articulable suspicion to carry on a *Terry* stop and Detective Odell's use of social media to endorse a political candidate. As discussed above, the allegation related to

---

[99] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

[100] *Connick v. Thompson*, 563 U.S. 51, 61 (2011)

[101] *Id.* (internal alterations omitted) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[102] *Id.* (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985)).

Detective Odell's improper use of social media bears no resemblance to the claims presented here. Even if Junction City's training program related to the use of social media was deficient, it does not follow that this deficiency would lead to the violation of a citizen's rights in the manner Plaintiffs allege.

When the dissimilar acts and Plaintiffs' conclusory statements that Junction City failed to train its officers are stripped away, all that is left is a single similar incident in which Detective Odell conducted a *Terry* stop without reasonable suspicion. Thus, the Plaintiffs are left to demonstrate the "obvious" consequence of failing to provide specific training based upon "single-incident-liability."[103] Plaintiffs argue that Detective Odell's *Terry* stop incident was similar enough to put Junction City on notice that its training program was deficient. But this single incident does not lead to the conclusion that Detective Odell "so often violated constitutional rights that the need for further training must have been plainly obvious to the city policy makers."[104] This is because "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program."[105] As such, Plaintiffs have not sufficiently alleged facts sufficient to impose liability upon Junction City based upon a failure to train or supervise Detective Odell.

Regarding Dr. Frazier, Plaintiffs respond that the Complaint sufficiently pleads that Junction City was on notice of Dr. Frazier's "well-documented history of fabricating child abuse." To establish this "well-documented history" Plaintiffs cite three examples that should have put Junction City on notice of Dr. Frazier's malfeasance: a 2021 article about misdiagnosing child abuse at CMH; a 2022 bill introduced in the Missouri Legislature that focuses on preventing

---

[103] *Id.* at 63.

[104] *Canton*, 489 U.S. at 390 n.10.

[105] *Id.* at 391.

children from being "abducted by Children's Mercy Hospital;" and a 2023 New Jersey case affirming a finding that the shaken baby/abusive head trauma theory is scientifically unreliable. Immediately after providing a much-too-lengthy description of these documents, Plaintiffs allege that Junction City hired Dr. Frazier in 2013. But publications dated 8-11 years *after* Junction City hired Dr. Frazier could not have provided Junction City with the requisite notice that it needed to better train or supervise Dr. Frazier. Plaintiffs have not pled facts to demonstrate that it was "plainly obvious" that Dr. Frazier needed extra training or supervision.

In sum, Plaintiffs have not pled facts sufficient to demonstrate that Junction City was deliberately indifferent to the risk of constitutional violations by failing to adequately train or supervise either Detective Odell or Dr. Frazier.

        c.      Ratification

Finally, Plaintiffs seek to show that Junction City had a policy of permitting constitutional violations through the ratification of Detective Odell's conduct. This form of showing an unconstitutional policy under *Monell* requires that a plaintiff allege "that the final policymaker affirmatively approved a subordinate's decision and the basis for it."[106] Plaintiffs cite no specific conduct of which Junction City is to have ratified. Rather, they generally allege Junction City ratified "unconstitutional conduct." Plaintiffs seek to show ratification through Detective Odell's promotion and by Junction City's increased budget for law enforcement in 2013. However, Plaintiffs do not allege that Detective Odell is a final policymaker, nor do they identify who the final policymaker is that supposedly ratified Detective Odell's unconstitutional conduct or the basis for it. Rather, Plaintiffs rely on broad statements and legal conclusions that Junction City

---

[106] *Dempsey v. City of Baldwin City*, 333 F. Supp. 2d 1055, 1071 (D. Kan. 2004) (emphasis removed) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

ratified generalized unconstitutional conduct. In short, Plaintiffs' pleading is factually insufficient to demonstrate that Junction City ratified Detective Odell's unconstitutional conduct.

In sum, Plaintiffs fail to plead facts showing that Junction City had a policy or custom through any of the forms they assert. As such, Plaintiffs have not sufficiently pled the first element to their *Monell* claims against Junction City. Therefore, Counts VII and XI are dismissed against Junction City.

### 2. *Geary County*

Geary County also moves for judgment on the pleadings under Rule 12(c) on the *Monell* claims presented against it. Plaintiffs first challenge to Geary County's motion is procedural. Plaintiffs rightly point out that a motion for judgment on the pleadings is premature because not all Defendants have filed Answers.[107] Geary County replies that the Court can reach the merits of its motion because the standard of review for a motion brought under 12(c) is the same as one brought under 12(b)(6).[108] Because the substance of Geary County's pending motion will not change if refiled pursuant 12(b)(6), and the standard to address the motion is the same, the Court will exercise its discretion and construe this motion as one brought under 12(b)(6).[109]

As discussed above, Plaintiffs Complaint makes clear that only Dr. Mitchell's actions can fairly be said to be attributable to Geary County as he is the Individual Defendant identified in the Complaint as an employee of Geary County.[110] The only claims remaining against Dr. Mitchell

---

[107] Fed. R. Civ. P. 12(c) ("After the pleadings are closed . . . a party may move for judgment on the pleadings.").

[108] *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).").

[109] *See* 5C CHARLES ALAN WRIGHT & ARHTUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1368 (3d ed. 2025) ("Because of the similarity between the Rule 12(c) and Rule 12(b) standards, courts typically will construe a premature Rule 12(c) motions as if it were brought under Rule 12(b).").

[110] In any event, the *Monell* analysis and conclusions regarding the existence of a policy or custom can be said to apply equally to Junction City as to Geary County and vice versa. As such, even if the Individual Defendants

are Count I, fabricating evidence; Count II, conspiracy to fabricate evidence; and Count IV, malicious prosecution claim. Because a *Monell* claim depends upon an underlying constitutional violation[111] and because these are the only remaining claims against Dr. Mitchell, the Court will only address whether Plaintiffs have sufficiently pled facts to plausibly allege that Geary County can be held liable for Dr. Mitchell's actions.

Plaintiffs allege that Geary County is liable for the actions of Dr. Mitchell because it had a policy or custom taking the form of (1) a widespread practice amounting to a custom; (2) failure to adequately train and supervise; and (3) ratification.[112] The Court addresses each alleged form in turn.

a.    Widespread Practice

Plaintiffs allege that Geary County is liable for Dr. Mitchell's fabrication of evidence claims because it maintained informal customs amounting to a widespread practice of violating citizens' constitutional rights. Specifically, Plaintiffs point to their allegations that "Municipality Defendants have a documented history of admitting to known existence of this culture of unconstitutional conduct" and "Municipality Defendants continue to fail to seriously investigate the misconduct occurring on their watch." They also point to quotations from several news articles that document Dr. Mitchell's "well-publicized history of unethical, unprofessional, and illegal activities as a coroner." One article reports that Dr. Mitchell, while employed as a medical

---

were considered the employees or agents of both Municipal Defendants, the alleged constitutional violations were not the result of a Junction City or Geary County policy or custom.

[111] *Crowson*, 983 F.3d at 1186 (collecting cases demonstrating the appropriate disposition of claims against municipalities under *Monell* is dismissal when there is no underlying constitutional violation).

[112] Paragraph 38 of Plaintiff's Complaint does allege that the "acts of Mitchell may fairly be said to present the official policy of Municipal Defendants [because] he served as his own immediate supervisor." But Plaintiffs do not use this allegation to advance their *Monell* liability argument. Accordingly, the Court will not address whether this allegation is sufficient to show the existence of an official policy of Geary County.

examiner in New York, routinely removed organs from corpses without the consent of the victims'
families and that he improperly stored skeletons and other body parts in his office. Another article
reports that Dr. Mitchell donated prostates, bladders, and testicles from about 150 bodies to a
medical school for scientific research without the permission of families. A third article reports the
settlement of four lawsuits that arose out of Dr. Mitchell's improper donations. Further, Plaintiffs
allege that Dr. Mitchell fled New York to avoid criminal prosecution for these reported incidents.

These reports, Plaintiffs allege, amount to a widespread practice of violating citizens'
rights. But these allegations do not show a widespread practice amounting to a *Geary County*
policy or custom for two reasons. First, the articles are from Dr. Mitchell's time as a medical
examiner in New York—not from his time with Geary County. Second, the reported misconduct
is dissimilar to the alleged constitutional violation at question here—i.e., Dr. Mitchell's framing
Mr. Lyman through the fabrication of evidence, conspiring to fabricate evidence, and maliciously
prosecuting Mr. Lyman. In short, Plaintiffs fail show, outside of their own experience, that Dr.
Mitchell regularly committed constitutional violations. As such, Plaintiffs have not sufficiently
pled facts to show that Geary County maintained a policy or custom through a widespread practice
of its employees that led to these constitutional violations.

b.    Failure to Train

Next, Plaintiffs assert that Geary County's failure to adequately train Dr. Mitchell amounts
to a custom or policy that caused the constitutional violations alleged in their Complaint. Plaintiffs
cite to the same facts as before—Dr. Mitchell's improper activities as a medical examiner in New
York—to support this theory. Plaintiffs allege that these articles should have put Geary County on
notice that Dr. Mitchell needed extra training. But, again, the dissimilarity between the improper
activities and the allegations here is key. It is illogical to conclude that Dr. Mitchell's improper

donation of organs could have put Geary County on notice that he needed extra training to not fabricate evidence. As such, Plaintiffs have not sufficiently pled facts to show that Geary County failed to train or supervise Dr. Mitchell.

c.      Ratification

Finally, Plaintiffs assert that Geary County is liable for Dr. Mitchell's actions because Geary County ratified his misconduct. Plaintiffs assert that Geary County ratified Dr. Mitchell's previous misconduct by failing to investigate or reprimand him for his previous constitutional violations. But again, the dissimilarity between Dr. Mitchell's previously documented misconduct and the allegations here interrupts the logical thread. Failing to investigate or reprimand Dr. Mitchell for donating organs without consent does not equate to approving of his efforts to fabricate and frame Mr. Lyman. As such, Plaintiffs have not sufficiently pled facts to support a claim that Geary County ratified Dr. Mitchell's conduct.

In sum, Plaintiffs fail to allege facts to support their claim that Geary County maintained an informal policy or custom—through widespread practice, failure-to-train, or ratification—that led to Dr. Mitchell's violation of Plaintiffs' constitutional rights. As such, they cannot meet the first element of a *Monell* claim. Therefore, Counts VII and XI are dismissed against Geary County.

**K.      Count V & XI: Conspiracy Claims against the Municipal Defendants**

Junction City and Geary County move to dismiss the conspiracy claims against them in Counts V and XI. In large part, Junction City and Geary County present the same arguments for dismissal. Plaintiffs' response to each motion is largely the same. Further, the factual and procedural posture of each motion is largely the same since the Court dismisses the *Monell* claims as to each Municipal Defendant. Accordingly, the Court will analyze both motions together.

The Municipal Defendants assert that Plaintiffs' conclusory allegations of their participation in the conspiracies are not enough to sustain the claim. Plaintiffs respond by pointing

to actions allegedly committed by Detective Odell, Dr. Frazier, and Dr. Mitchell which Plaintiffs say demonstrates the Municipal Defendant's participation in the conspiracy.

"To state a § 1983 conspiracy claim, [a plaintiff must] allege 'specific facts showing an agreement and concerted action among defendants.'"[113] But as with any other § 1983 action brought against a municipality, Plaintiffs must assert the municipality's participation in the conspiracy pursuant to the familiar *Monell* framework.[114] That is, a plaintiff must allege "(1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the violation alleged."[115] In other words, Plaintiffs must plead that the conspiracy to violate Plaintiffs' constitutional rights was caused by a municipal custom or policy.

*Douglass v. Garden City Community College* is instructive.[116] There, the district court analyzed a § 1983 conspiracy claim brought against a municipality using the familiar *Monell* framework.[117] The district court concluded that the plaintiffs sufficiently pled that the municipality's employees violated the plaintiff's rights when they conspired to deter her from reporting or testifying about Title IX issues. The district court found that "because plaintiff ha[d] alleged that the conspiratorial conduct of [the municipality's] employees was taken pursuant to [the municipality's] Title IX policy, it may be subject to municipal liability."[118]

---

[113] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (quoting *Tonkovich*, 159 F.3d at 533)).

[114] *See Rieves v. Town of Smyrna*, 67 F.4th 856, 866 (6th Cir. 2023) ("[N]o case law exists to suggest that the standard for *Monell* liability in the conspiracy context differs from the general standard.").

[115] *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1061 (D. Kan. 2021) (citing *Monell*, 436 U.S. at 694) (further citation omitted).

[116] 543 F. Supp. 3d 1043 (D. Kan. 2021).

[117] *Id.* at 1061.

[118] *Id.*

Unlike the plaintiffs in *Douglass*, Plaintiffs do not allege that Junction City or Geary County had formal policies that were the moving force behind the individual Defendants' actions. Rather, Plaintiffs allege that the Municipal Defendants participated in the conspiracy though their "intentional failure to adequately screen, train, and discipline its employees."[119] But, as discussed above, Plaintiffs have not pled facts sufficient to find that the Municipal Defendants are liable based upon a failure-to-train-or-supervise theory. As such, Plaintiff's conspiracy claim against the Municipal Defendants fails.

### IV.    Conclusion

With the various claims presented by several Plaintiffs against several Defendants, each addressed by several different motions, the Court will summarize the lay of the land after its analysis. The claims remaining against Detective Odell are Mr. Lyman's Counts I-VI and E.L. and M.L.'s Counts VIII-XII. The claims remaining against Dr. Frazier are Mr. Lyman's Counts I-VI and E.L. and M.L.'s Counts XI and XII. The claims remaining against Dr. Mitchell are Mr. Lyman's Counts I, II, and IV. The Court dismisses all claims against the Municipal Defendants. Finally, the Court finds that Ms. Thompson's claims as barred by the statute of limitations.

**IT IS THEREFORE ORDERED** that Defendant Junction City's Motoin to Dismiss (Doc. 20) is **GRANTED**.

**IT IS FURTHER ORDERED** that Dr. Frazier's Motion to Dismiss (Doc. 28) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Geary County's Motion for Judgment on the Pleadings, construed as a Motion to Dismiss (Doc. 31) is **GRANTED**.

---

[119] Doc. 1 at ¶¶ 395, 463.

**IT IS FURTHER ORDERED** Detective Odell's Motion for Judgment on the Pleadings, construed as a Motion to Dismiss (Doc. 43) is **GRANTED**.

**IT IS FURTHER ORDERED** that Dr. Mitchell's Motion to Dismiss (Doc. 46) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED**.

Dated this 8th day of October, 2025.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE